**Opinion filed July 30, 2026**



# In The

# Eleventh Court of Appeals

_____

## No. 11-25-00033-CV

_____

## RAITZ ENTERPRISES, INC., D/B/A U.S. SAND AND GRAVEL, Appellant

## V.

## JAVIER SANCHEZ, JR., Appellee

**On Appeal from the County Court at Law**
**Erath County, Texas**
**Trial Court Cause No. CV09507**

## M E M O R A N D U M   O P I N I O N

This appeal concerns a contractual dispute between a general contractor and its subcontractor. Appellant, Raitz Enterprises, Inc., d/b/a U.S. Sand and Gravel (the general contractor), engaged Appellee, Javier Sanchez, Jr. (the subcontractor), to perform concrete work on three separate construction projects. When problems ensued with one of the projects, Raitz refused to pay Sanchez for work he performed

on all three projects; Sanchez then sued Raitz for breach of contract, quantum meruit, and unjust enrichment. After a jury trial, the jury found that Raitz failed to comply with the parties' agreements, awarded Sanchez $26,640 in damages, and found reasonable and necessary attorney's fees for each of the contracts. The trial court rendered judgment on the jury's verdicts and awarded Sanchez $87,417.50 in attorney's fees.

On appeal, Raitz raises five issues: (1) the evidence is legally and factually insufficient to support the jury's liability and damages findings; (2) the trial court abused its discretion when it excluded certain testimony proffered by Casey Raitz; (3) the trial court abused its discretion when it refused to submit Raitz's requested jury instruction; (4) the trial court's denial of Raitz's request to amend its pleadings was an abuse of discretion; and (5) the evidence is legally and factually insufficient to support the award of attorney's fees.

We affirm the trial court's judgment and hold that: (1) the evidence is sufficient to support the jury's liability and damages findings, because the jury found that Raitz failed to comply with the agreements and Sanchez did not; (2) the evidence is sufficient to support the jury's award of attorney's fees; and (3) the trial court did not err or abuse its discretion when it (a) excluded Casey Raitz's proffered testimony and (b) denied Raitz's requested jury instruction and pleading amendment.

## I. *Factual Background*

This dispute centers on three concrete jobs that Raitz hired Sanchez to complete: the Woodlands project, the Slab project, and the Iredell project. The concrete for each job was supplied by Big State Concrete, which Casey Raitz, the owner of Raitz Enterprises and U.S. Sand & Gravel, also partially owned. Sanchez had completed another concrete job for Raitz in the past in which Raitz supplied the concrete and paid Sanchez.

2

Big State Concrete used volumetric trucks, which mix the ingredients that are required to make concrete—sand, gravel, water, and cement—inside an auger that is mounted on a truck. Volumetric trucks differ from "barrel-type" cement trucks that are more typically seen on the road, which carry concrete that is pre-mixed at a concrete plant and loaded into a truck for delivery to a job site.

A. *The Woodlands Project*

Raitz hired Sanchez to complete the Woodlands project—a large job for which Raitz agreed to pay Sanchez $38,540. Sanchez was not paid any amount until this project was about three-quarters completed, at which point he informed Raitz that he would cease working on the project until he was paid; Raitz then paid him one-half of the agreed price: $19,270. Sanchez testified that Raitz also agreed to reimburse him for one-half of the rental cost—$1,745—of a pump truck. Although a text message from Raitz's representative stated "Casey probably isn't going to approve half on the pump," Sanchez testified that the reimbursement was approved in a subsequent phone call. After the completion of the Woodlands project, even though Sanchez requested payment multiple times and did not receive any complaints about the quality of the work that he performed, Raitz never paid him the second half of the price for this project, nor did he reimburse him for one-half of the pump truck rental.

B. *The Slab Project*

While Sanchez was working on the Woodlands project, Raitz hired him to complete another job, the Slab project, at a facility for U.S. Sand & Gravel. The parties did not formally discuss or agree on a price for this job. Sanchez testified that he performed preparatory work for the Slab project, such as digging and forming the soil, installing footing, and removing large rocks. After the preparatory work was completed, the remaining tasks were to set rebar and pour concrete. Sanchez testified that he estimated the value of the work that he completed on the Slab project

to be $4,950, based on a rate of $110 per hour for over eleven hours of work performed by him and three hired workers. However, Sanchez alleged in his petition that he only performed five hours of work on the Slab project, at a rate of $110 per hour.

Casey testified that he discussed the Slab project with Sanchez, but ultimately Sanchez did not perform any work on this project and Casey paid someone else to do it. Casey agreed that multiple texts between he, Raitz's project manager Kylee Fields, and Sanchez indicated that Sanchez worked on the Slab project, but he asserted that because Sanchez never provided him with a formal estimate, it was never confirmed that Sanchez would work on the Slab project. But he also agreed that, after the Iredell pour and amidst the ensuing dispute, he texted Sanchez, "Go ahead and stop eastland yard [w]e are going another route," which referred to the Slab project. Consequently, Sanchez never set rebar or poured the concrete for the Slab project, nor was he paid for the preparatory work that he had completed there.

C. *The Iredell Project*

Before Sanchez could complete the Slab project, Raitz asked him to pause work on it and focus on another job—the Iredell project. Sanchez quoted a price of $10,250 to Raitz for the Iredell project. Sanchez and five workers excavated the site and completed preparatory work. However, problems ensued when they began to pour the slab.

To pour the concrete that was mixed in these volumetric trucks, the Iredell project required a rented pump truck that could pump the concrete out of the volumetric truck through a hose. When they began to pour the Iredell slab, the concrete mix began clogging the pump. Sanchez testified that the supply of gravel and cement—ingredients required to mix concrete—provided by Raitz kept running out. He testified that he informed Raitz over the phone that something was wrong, but he was instructed to continue pouring the concrete.

Sanchez testified that these problems required the volumetric truck to leave the jobsite multiple times to refill the missing ingredients. These delays affected the quality of the concrete that had already been poured; Sanchez testified that the optimal way in which to pour a concrete slab is to do it all at one time because if one pours new, wet concrete next to concrete that has begun to set, a seam—sometimes called a "cold joint"—is created that can lead to cracks in the slab. Multiple "cold joints" occurred at the Iredell job because of the delays caused by the concrete mix problems.

Rick Rodriguez, Jr., the operations manager for PumpCrete, the concrete pump company, told Sanchez over the phone that the concrete mix was defective. Later in the day, Rodriguez sent Sanchez a video of a clog in the pump; Rodriguez could be heard in the video explaining that there was no sand in the mix, which was clogging the pump. Rodriguez advised Sanchez to check the concrete mix because of these problems.

Rodriguez testified that volumetric trucks tend to jam and have issues. According to Rodriguez, he had worked in the concrete business for eleven years and had completed over a thousand jobs that involved concrete pours. At the Iredell project, the pump truck struggled to pump because the volumetric trucks were jamming and the auger could not mix the concrete ingredients correctly. Rodriguez testified that the mixture was either too rocky or too sandy; this required the supervisor for the concrete supply company to adjust and readjust the mixture ratios multiple times. The volumetric trucks also ran out of ingredients—sand and gravel—which required the trucks to leave the jobsite to be refilled, as well as to be cleared of the jamming problems. Because of these issues with the mix, the pump truck had to stop operating and cleared multiple times. These were consistent problems throughout the pour.

Eventually, the pump truck became entirely jammed and disabled; PumpCrete left the jobsite to clean out the pipes of their pump truck before the concrete set inside the pipes. This process delayed the pour for approximately four hours. While cleaning out the pump truck, Rodriguez video recorded the concrete mix that came out of the pipes and sent the video to Sanchez. Rodriguez testified that because the mix was defective, it did not set in the pump truck pipes in the way they had expected and instead appeared to be a large unhardened "clump" that never bound. This was a further indication, according to Rodriguez, that the concrete mixture was defective; it should have set hours before the pump truck was cleaned.

Rodriguez testified that the crumbling curbs were the result of the defective concrete mix. He further testified that the defects in the Iredell job were not the kind of flaws that could be attributed to the pourer, like Sanchez. Rodriguez stated it was "more than likely that's [a result of] bad mix . . . unless somebody purposely and neglectfully decided just to shape it with their hand and leave it . . . I've never seen concrete do that that's properly mixed." He agreed that a bad finish or removing the forms too soon could also cause defects in the slab. He also agreed that problems could arise from not having enough workers on a job. But Rodriguez testified that he did not believe these issues arose from removing the forms too early because such defects would likely run the length of the form, and the defects in the Iredell slab appeared to be more scattered.

Casey denied that the issues on the Iredell project were because of a bad mix of concrete. He testified that, although he was not present during the pour, it is not possible for a mix to be deficient because his volumetric trucks are computer-operated and preprogrammed, and a bad mix would have triggered an automatic shutdown of a truck. He testified that the trucks' computers also printed a report of the precise mix components, but he was not in possession of those reports because he had sold his interest in Big State Concrete. When Sanchez texted Casey the video

6

from Rodriguez that showed the "clump" that came out of the pump truck from the Iredell project, Casey responded: "That's not what went in concrete truck the entire time. Cannot blame this on concrete from one little part they pulled out. I have every ticket with [exact] pounds of everything that got poured." Casey agreed that any machine can operate incorrectly and testified that although he saw the video that Rodriguez sent of the large "clump" that came out of the pump truck, it was impossible for the volumetric trucks to produce a "clump" of sand that large.

D. *The Dispute*

Sanchez stated in a text message to Raitz that the Iredell slab was defective because the concrete mix was bad and the waiting time on the concrete trucks was problematic during the pour. Sanchez attempted to repair the Iredell slab by grinding down parts of it with a rented grinder. He suggested the use of a two-inch overlay of pea gravel as another repair option. He also offered to demolish the slab so Raitz could restart the project from scratch, stating, "[N]o charge the least I can do s[]ince I left a bad finish on that slab." Throughout the contentious aftermath of the Iredell project, Sanchez also continued to request payment for the Woodlands project.

Raitz refused to pay Sanchez the balance for the Woodlands project or for any other project. Casey texted Sanchez that Raitz had hired another company to repair the Iredell slab, that Sanchez was "on the hook" for the slab, and that Raitz would not pay Sanchez anything until the Iredell slab was repaired and the cost of repairs would be deducted from the balances due Sanchez.

After another refusal by Raitz to pay the Woodlands balance, Sanchez replied: "I'm not charging you iradell [sic] i know you your not paying me for that job I get it I lost money there it is what it is that's why I didn't mention it in the first place . . . my concern is on my money that is owed to me on the [Woodlands] job." Sanchez testified that he made those statements because he needed to be paid for the Woodlands project, he did not believe that any argument with Casey about fault

would be productive, and he wanted to preserve a business relationship with Raitz. Sanchez testified that, despite those statements, he did not leave a bad finish on the Iredell slab, and he did the best he could with the bad concrete mix that Raitz provided. He believed that he did not have much leverage to negotiate with Raitz since Raitz insisted that Sanchez, not the concrete mix, was to blame for the defects in the Iredell slab.

A few days after the Iredell pour, Raitz paid Sanchez $5,125—one-half of the quoted price for the Iredell project. At that point, according to Sanchez, Raitz still owed, but refused to pay him:

- $19,270, the remaining balance for the Woodlands project;
- $5,125, the remaining balance for the Iredell project;
- reimbursement for one-half the rental payment to PumpCrete during the Woodlands project; and
- the value of the preparatory work Sanchez performed on the Slab project.

Sanchez sued Raitz for breach of contract, quantum meruit, and unjust enrichment. Raitz counterclaimed for breach of contract and breach of implied warranty of good and workmanlike services. At trial, the trial court excluded Raitz's proffered evidence—Casey's testimony—about the cost of remedial repairs for the Iredell slab, because the issue required expert testimony and Raitz did not designate Casey as an expert witness on the subject. Raitz made an offer of proof outside the presence of the jury in which Casey testified that, based on his firsthand knowledge and experience, the Iredell slab was deficient, and it was necessary to grind down the slab and apply an epoxy finish to correct and complete the job. Casey further testified that the cost charged by the other contractors he hired to complete these repairs was reasonable and necessary.

The jury found that Raitz failed to comply with the Woodlands agreement and awarded Sanchez damages of $19,225, the balance of the agreed price, as well as

8

$1,745 as reimbursement for one-half of the rental payment due to PumpCrete. The jury also found that Sanchez performed compensable work for Raitz on the Slab project and awarded him $550 as the reasonable value of the compensable work. Finally, the jury found that Raitz, not Sanchez, failed to comply with the Iredell agreement and awarded Sanchez $5,120 for the balance of the agreed price for the Iredell agreement. The jury also awarded attorney's fees to Sanchez for the three projects. The trial court signed a final judgment awarding Sanchez $26,640 in total damages and $87,417.50 in attorney's fees.

## II. *Analysis*

### A. *The Evidence is Sufficient to Support the Jury's Verdicts*

In its first issue, Raitz claims that the evidence is legally and factually insufficient to support the jury's liability and damages findings because, under the doctrine of substantial performance, the burden was on Sanchez to establish the cost of remedial repairs, and Sanchez offered no such evidence. Raitz also asserts that the jury's finding that Sanchez did not breach the Iredell agreement is against the great weight and preponderance of the evidence because Sanchez admitted that he was responsible for the defects in the Iredell slab.

We hold that the doctrine of substantial performance is inapplicable to this case because the jury found that Sanchez did not breach the Iredell agreement, and therefore Sanchez bore no burden to establish the cost of remedial repairs. *Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc.*, 889 S.W.2d 666, 670 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("The jury found that Tacon, and not Grant, breached the contract. Therefore, the doctrine of substantial performance is inapplicable."). Moreover, the jury's finding that Raitz, and not Sanchez, failed to comply with the Iredell agreement is not against the great weight and preponderance of the evidence. The jury was free to credit the evidence that the flaws in the slab were caused by defective concrete supplied by Raitz, as well as Sanchez's testimony

9

that his text admitting fault was a desperate concession by him in an attempt to obtain payment for the Woodlands project, which Raitz was withholding, rather than a true admission of fault. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005).

1. *Standards of Review: Legal and Factual Sufficiency*

When parties challenge the legal sufficiency of the evidence to support an adverse finding on which they did not have the burden of proof at trial, they must demonstrate that there is no evidence to support the adverse finding. *Mullins v. McWhirter*, 724 S.W.3d 571, 578 (Tex. App.—Eastland 2025, pet. denied) (citing *City of Keller*, 168 S.W.3d at 827); *see Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Under a legal sufficiency review, we consider all the evidence in the light most favorable to the prevailing party, make every reasonable inference in that party's favor, disregard contrary evidence unless a reasonable factfinder could not, and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 807, 822, 827.

The evidence is legally insufficient to support a finding only if: (1) the record discloses a complete lack of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a scintilla of evidence to prove a vital fact; or (4) the evidence conclusively established the opposite of a vital fact. *United Rentals N. Am., Inc. v. Evans*, 668 S.W.3d 627, 640 (Tex. 2023) (citing *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018)); *City of Keller*, 168 S.W.3d at 810. "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Mullins*, 724 S.W.3d at 578 (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). "More than a scintilla of evidence exists when the evidence would enable reasonable and fair-minded people to reach different conclusions." *Id.* at 578–79 (quoting *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014)). "However, if the evidence is so weak that it only

creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Id.* at 579 (quoting *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014)).

"When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the finding." *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 324 (Tex. App.—Houston [14th Dist.] 2021, pet. denied) (citing *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.)). We must review the evidence in a neutral light. *Gonzalez v. Sanchez*, 717 S.W.3d 516, 527 (Tex. App.—Eastland 2025, no pet.) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001)). If we set aside a judgment on the basis that a vital finding is not supported by factually sufficient evidence, we must detail the evidence that is relevant to the issue and specify how the contrary evidence greatly outweighs the evidence that supports the finding. *Id.* (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)).

When a party attacks the factual sufficiency of an adverse finding on an issue on which it had the burden of proof, such as here, the party must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Francis*, 46 S.W.3d at 242. However, when a party challenges the factual sufficiency of the evidence to support a finding on an issue for which it did not have the burden of proof at trial, we will set aside the finding only if the evidence in support of the finding is so weak or contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Gonzalez*, 717 S.W.3d at 527 (citing *Pool*, 715 S.W.2d at 635); *Cowan v. Worrell*, 638 S.W.3d 244, 254 (Tex. App.—Eastland 2022, no pet.).

11

2. *Breach of Contract, Substantial Performance, and the Proper Measure of Damages*

To prevail on a breach-of-contract claim, a party must establish: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff because of the defendant's breach. *Caprock Inv. Corp. v. Montgomery*, 321 S.W.3d 91, 99 (Tex. App.—Eastland 2010, pet. denied). Breach-of-contract damages may be direct, consequential, or both. *SM Energy Co. v. Buzzard Roost Farms, Inc.*, 727 S.W.3d 525, 550 (Tex. App.—Eastland 2025, no pet.) (citing *Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022)). The appropriate measure of damages for a breach-of-contract claim is the benefit of the bargain denied to the injured party; its purpose is to restore the injured party to the economic position he would have enjoyed had the contract been performed. *Id.* at 551 (citing *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th Dist.] 2006, pet. denied)).

Generally, a contracting party who is in default cannot maintain a suit for breach. *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990). But the doctrine of substantial performance "allows a party to a contract, *who is himself in breach* but who nevertheless substantially completed performance, to recover damages for that performance." *Tacon*, 889 S.W.2d at 670 (emphasis added) (citing *Dobbins*, 785 S.W.2d at 378). In the context of a contractual dispute between a subcontractor and a contractor, substantial performance is an equitable doctrine "that was adopted to allow a [subcontractor or] contractor who has substantially completed a construction contract to sue on the contract rather than being relegated to his cause of action for quantum meruit." *Kelly v. Tracy*, No. 01-18-00913-CV, 2022 WL 2837335, at *6 (Tex. App.—Houston [1st Dist.] July 21, 2022, no pet.) (mem. op.) (quoting *Vance v. My Apartment Steak House*, 677 S.W.2d 480, 482 (Tex. 1984)); *see*

12

*Atkinson v. Jackson Bros.*, 270 S.W. 848, 850 (Tex. Comm'n App. 1925, holding approved).

In such cases, although the contractor is permitted to sue on the contract, his recovery is reduced by the cost of curing those defects for which he is responsible. *4922 Holdings*, 625 S.W.3d at 329 (citing *Vance*, 677 S.W.2d at 482). It is the plaintiff contractor's burden to plead and prove his entitlement to recovery under a theory of substantial performance. *Kelly*, 2022 WL 2837335, at *6 (citing *Carr v. Norstok Bldg. Sys., Inc.*, 767 S.W.2d 936, 940 (Tex. App.—Beaumont 1989, no writ)). In that context, substantial performance is regarded as a condition precedent to the right to sue on a contract. *Id.* (citing *Atkinson*, 270 S.W. at 850).

### 3. *Application*

Raitz contends that because "every case involving a disputed construction defect amounts to either a case of substantial performance . . . or no substantial performance," the doctrine of substantial performance is inapplicable to a breach-of-contract claim in which the suing contractor did not breach the agreement. *See Tacon*, 889 S.W.2d at 670; *Emerson Constr. Co., Inc. v. Ranger Fire, Inc.*, No. 03-09-00567-CV, 2013 WL 4817551, at *5–6 (Tex. App.—Austin Aug. 29, 2013, no pet.) (mem. op.).

The jury found that Sanchez did not breach the Iredell agreement. Because it is undisputed that Sanchez did not offer any evidence of the cost of remedial repairs for that project, if the doctrine of substantial performance did apply, the evidence would be legally insufficient to support the jury's finding. *Mullins*, 724 S.W.3d at 578 (citing *City of Keller*, 168 S.W.3d at 827); *Francis*, 46 S.W.3d at 242. Whether the doctrine applies turns on whether Sanchez breached that agreement. *Tacon*, 889 S.W.2d at 670; *see Emerson Constr.*, 2013 WL 4817551, at *5–6.

Although it is undisputed that the Iredell slab was defective, causation was a contested issue at trial. Raitz contends that because Sanchez stated in a text that he

13

"left a bad finish" on the Iredell project, that he would not seek the remaining balance for that project, and that he attempted to repair the slab himself, he admitted to breaching the agreement. Sanchez argues that Raitz's evidence does not establish that the jury's finding is against the great weight and preponderance of the evidence because (1) there is substantial evidence that the defects in the slab were caused by the defective concrete that Raitz supplied for the project, and (2) Sanchez explained in his trial testimony that his text admission was a desperate attempt to negotiate payment for the Woodlands project, not a true admission of fault.

There was an abundance of evidence presented that the concrete mix was defective, and the cause of the problems that were associated with the Iredell slab. Sanchez testified that the concrete mix repeatedly clogged the pump truck and that the volumetric trucks continuously experienced issues and delays, which resulted in "cold joints" in the slab and a crumbling finish. Rodriguez similarly testified to the clogging and mixing problems with the trucks, and he also blamed the concrete mix for causing these problems. Rodriguez testified that he had never seen properly mixed concrete cause the crumbling that occurred with the Iredell slab. He also sent a video of the contents of the pump truck: a large "clump" that had failed to set into concrete even after hours of remaining in the truck's pipes. Meanwhile, Casey asserted that it was not possible for the volumetric trucks to produce such a "clump" or mix the concrete so poorly, but he did not offer any evidence to support these assertions. And although Sanchez texted that he would not charge Raitz for the Iredell project and that he left a bad finish on the slab, he explained that he made those statements out of desperation to convince Raitz to pay him for the Woodlands project and in an attempt to preserve a business relationship between them, and that the concrete mix was the cause of the defects in the slab.

The jury was free to credit, weigh, believe, and disbelieve all, some, or none of the testimony and evidence presented. *Gonzalez*, 717 S.W.3d at 535 (citing

*Golden Eagle Archery, Inc v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). Sanchez admitted fault in texts that he sent to Raitz but testified at trial that the admissions were a negotiation technique and were not true. Likewise, Sanchez and Rodriguez testified that the concrete mix was deficient and would not set properly, although Casey testified to the contrary because he claimed that his volumetric trucks were computer-operated and preprogrammed, and a bad mix would have triggered an automatic shutdown. Conflicting evidence such as this falls within the jury's province to resolve, and therefore the jury's findings on that point should not be disturbed. *Id.* (citing *City of Keller*, 168 S.W.3d at 807, 822, 827).

We conclude that the evidence before us supports the jury's finding that Sanchez did not breach the Iredell agreement, and that this evidence was not so weak or against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Id.* (citing *Pool*, 715 S.W.2d at 635). Thus, because the evidence is factually sufficient to support the jury's finding, the doctrine of substantial performance is not applicable to this case, and Sanchez bore no burden to establish the cost of remedial repairs for the Iredell slab. Further, because there is more than a scintilla of evidence to support the jury's finding, we conclude that the evidence is legally sufficient as well. *Mullins*, 724 S.W.3d at 578–79.

Accordingly, we overrule Raitz's first issue.

B. *The Exclusion of Casey's Testimony was not Error*

In its second issue, Raitz contends that the trial court abused its discretion when it erroneously excluded Casey's testimony on the cost of remedial repairs on the grounds that expert testimony was required and Raitz did not designate an expert witness to testify on this subject.

Even if the trial court's decision to exclude Casey's testimony—regarding the cost of repairs for the Iredell slab on the basis that Raitz did not designate Casey as an expert witness—was erroneous, and we do not hold that it was, any such error

15

was harmless. If a trial court abuses its discretion and erroneously admits or excludes evidence, we must determine whether the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1); *Campbell v. Hendershot Equip. Co., Inc.*, 717 S.W.3d 494, 515 (Tex. App.—Eastland 2025, pet. denied). We review the entire record to determine whether an error is harmful. *Campbell*, 717 S.W.3d at 515 (citing *Gunn*, 554 S.W.3d at 668–69). Whether an erroneous exclusion of evidence probably caused the rendition of an improper judgment is "a judgment call entrusted to the sound discretion [and] good sense of the reviewing court from an evaluation of the whole case." *City of Stephenville v. Belew*, 692 S.W.3d 347, 361 (Tex. App.—Eastland 2024, pet. denied) (quoting *First Emps. Ins. Co. v. Skinner*, 646 S.W.2d 170, 172 (Tex. 1983)).

Raitz argues that even if Casey's testimony did not support a jury's finding on damages, it would have shown that Sanchez breached the contract and Raitz did not. Raitz contends that this excluded evidence was pertinent to "a key issue that was properly part of Sanchez's case in chief."

Casey testified during Raitz's offer of proof that, based on his personal knowledge and perception of the jobsite after the pour, the Iredell slab was not finished correctly and required repairs by grinding and applying an overlay and an epoxy finish. However, Casey was permitted to present similar testimony to the jury—that, in his opinion, the concrete mix in the Iredell project was not defective and was not the cause of the slab's defects. The remainder of Casey's testimony during the offer of proof concerned the cost of remedial repairs and their reasonableness and necessity. That constituted evidence of damages, not liability, and the jury foreclosed any consideration of Raitz's alleged damages when they found that Sanchez did not breach the Iredell agreement. *See Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 627 (Tex. App.—Dallas 2004, pet. denied) (holding that because the jury's finding of no liability was supported by sufficient evidence, the

exclusion of any evidence on the issue of damages was harmless because it could not have resulted in the rendition of an improper judgment).

We conclude that any error in excluding Casey's testimony was harmless.

Accordingly, we overrule Raitz's second issue.

C. *The Refusal to Submit Raitz's Requested Jury Instruction was not Error*

In its third issue, Raitz argues that the trial court abused its discretion when it refused to submit Raitz's requested jury instruction on the cost of repairs issue, again because, according to Raitz, the trial court failed to require Sanchez to prove up the costs of remedial damages under the "substantial performance" doctrine.

As Sanchez points out, no evidence was presented to the jury on the reasonable and necessary cost of repairs. In this regard, it is error to submit a question for which there is no evidence. *See Horton v. Kansas City S. Ry. Co.*, 692 S.W.3d 112, 137 (Tex. 2024) (citing *Harris Cnty. v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002)); *see also* TEX. R. CIV. P. 278 ("The court shall submit the questions, instructions and definitions . . . which are raised by the written pleadings and the evidence."). And again, even if the trial court erred, any error could not have resulted in the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *Mitchell*, 156 S.W.3d at 627 ("It is well established in Texas that no recovery is allowed unless liability has been established. In the absence of liability, the question of damages becomes immaterial." (citing *Turner v. Lone Star Indus., Inc.*, 733 S.W.2d 242, 246 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.))); *see also Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (observing that an error is harmless "when the findings of the jury in answer to other issues are sufficient to support the judgment" (quoting *Boatload of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980))); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995) (A jury question may be immaterial, and therefore the refusal of its submission is harmless,

"when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict.").

Here, the jury's finding that Sanchez did not breach the Iredell agreement precluded any damage finding in favor of Raitz for the Iredell project and thus rendered Raitz's proposed jury question immaterial. *See Mitchell*, 156 S.W.3d at 627; *see also Shupe*, 192 S.W.3d at 579; *Alvarado*, 897 S.W.2d at 752. Consequently, we conclude that the trial court did not err when it refused to submit Raitz's proposed jury instruction. *See* Tex. R. App. P. 44.1(a)(1).

Accordingly, we overrule Appellant's third issue.

D. *The Refusal to Grant a Pleading Amendment was not an Abuse of Discretion*

In its fourth issue, Raitz contends that the trial court abused its discretion when it denied Raitz's motion for leave to amend its pleadings to specifically deny that Sanchez presented a demand to Raitz for the Iredell project under Chapter 38 of the Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.002(2) (West 2015).

We review a trial court's ruling on a motion for leave to file an amended pleading for an abuse of discretion. *Lower Valley Water Dist. v. Danny Sander Constr., Inc.*, 657 S.W.3d 404, 408 (Tex. App.—El Paso 2022, no pet.). Under Rule 63 of the Texas Rules of Civil Procedure, a trial court must grant a party leave to amend its pleadings unless the party opposing the amendment presents evidence of surprise or prejudice, or the proposed amendment asserts a new cause of action or defense and is thus prejudicial on its face and the opposing party asserts a timely objection. *Id.* at 409 (citing *Greenhalgh v. Service Lloyds Ins., Co.*, 787 S.W.2d 938, 939 (Tex. 1990)); *see* Tex. R. Civ. P. 63. "However, when surprise or prejudice is demonstrated, either through evidence presented by the objecting party or on the face of a pleading asserting a new cause of action or defense, then the decision to

18

grant or deny the motion lies within the sound discretion of the trial court." *Danny Sander Constr.*, 657 S.W.3d at 409 (citing *Hardin v. Hardin*, 597 S.W.2d 347, 349–50 (Tex. 1980)).

To recover attorney's fees in a suit on a written contract, a plaintiff must plead and prove that the presentment of a contract claim was made to the opposing party, and the opposing party failed to tender performance. *See* CIV. PRAC. & REM. §§ 38.001–002; *Sandberg v. STMicroelectronics, Inc.*, 600 S.W.3d 511, 532 (Tex. App.—Dallas 2020, pet. denied) (citing *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981)); *Belew v. Rector*, 202 S.W.3d 849, 856–57 (Tex. App.—Eastland 2006, no pet.). The claimant bears the burden of pleading and proving that he made a presentment of the claim to the opposing party. *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 566 S.W.3d 801, 824 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (citing *Ellis v. Waldrop*, 656 S.W.2d 902, 905 (Tex. 1983)). No particular form of presentment is required; it may be done orally or in writing and need not be done by a party's counsel. *See Belew*, 202 S.W.3d at 857. Further, merely filing a breach-of-contract claim is insufficient. *Id.* However, if a plaintiff pleads that all conditions precedent have been met and the defendant fails to affirmatively deny presentment, the plaintiff is not obligated to produce specific evidence of presentment. *Id.*

Although Raitz contends that its proposed amendment would have merely cured a pleading defect, the assertion of the failure to satisfy a condition precedent is an affirmative defense. *See Danny Sander Constr.*, 657 S.W.3d at 408–10; *Belew*, 202 S.W.3d at 857. The assertion of a new defense is prejudicial on its face.[1] *Danny Sander Constr.*, 657 S.W.3d at 409 (citing *Greenhalgh*, 787 S.W.2d at 939); *see*

---

[1]The parties apparently argued this motion in chambers before the trial court denied it on the record. Although the trial transcript does not specifically show that Sanchez objected, it is apparent that the motion was contested on prejudice grounds.

TEX. R. CIV. P. 63. Moreover, Sanchez alleged in his pleadings that all conditions precedent were satisfied, over three years before Raitz filed its request for a pleading amendment and asserted, for the first time, its failure-to-satisfy-conditions-precedent defense. We conclude that the trial court did not abuse its discretion when it denied Raitz's motion for leave to amend its pleading. *See Danny Sander Constr.*, 657 S.W.3d at 408–10; *Belew*, 202 S.W.3d at 857.

Accordingly, we overrule Raitz's fourth issue.

E. *The Evidence is Sufficient to Support the Attorney's Fee Award*

In its fifth issue, Raitz contends that there is insufficient evidence to support the jury's attorney's fee award. Specifically, Raitz claims that the fee award requires a remand or remittitur because: (1) there was legally insufficient evidence presented that such a disproportionate fee shifting award was warranted; (2) evidence of the attorney's fees should have been excluded and its admission was harmful error; (3) there was insufficient evidence presented that the fees claimed were reasonable for the particular services performed and for the amount of time required to perform those services; (4) the evidence is factually insufficient to support the attorney's fee award and the award was excessive; and (5) if we reverse any of Sanchez's claims, he failed to present sufficient evidence of fee segregation.[2]

1. *Standards of Review*

The prevailing party on a claim for breach of contract may recover reasonable attorney's fees. *See* CIV. PRAC. & REM. § 38.001(b)(8); *Daily v. McMillan*, 531 S.W.3d 822, 824 (Tex. App.—Texarkana 2017, no pet.) (citing *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 40 (Tex. 2012)). In cases involving fee-shifting under Section 38.001, a rebuttable presumption exists that "the usual and customary attorney's fees for a claim of the type described in Section 38.001 are

---

[2]Because we affirm the jury's findings, we do not address Raitz's point regarding fee segregation.

20

reasonable," and the trial court may take judicial notice of the usual and customary attorney's fees and the contents of the case file without receiving further evidence in the proceedings before it. CIV. PRAC. & REM. §§ 38.003, .004; *Hall v. Lewis*, 639 S.W.3d 197, 212 (Tex. App.—Houston [1st Dist.] 2021, no pet.).

We review the amount of an attorney's fee award for legal sufficiency under the same standard articulated above. *See Hizar v. Heflin*, 672 S.W.3d 774, 799 (Tex. App.—Dallas 2023, pet. denied) (citing *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 490 (Tex. 2019)). When a party challenges the legal sufficiency of the evidence to support a finding on which it did not have the burden of proof at trial, as here, the party must demonstrate that no evidence exists to support the adverse finding. *Good v. Baker*, 339 S.W.3d 260, 268 (Tex. App.—Texarkana, 2011, pet. denied); *Croucher*, 660 S.W.2d at 58. Similarly, when a party challenges the factual sufficiency of the evidence to support a finding on which it did not have the burden of proof, we consider and weigh all the evidence both in support of and contrary to the challenged finding. *Lakepointe Pharmacy #2, LLC v. Forney Deerval, LLC*, No. 05-19-01224-CV, 2021 WL 248667, at *2 (Tex. App.—Dallas Jan. 26, 2021, pet. denied) (mem. op.).

Further, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Id.* at *3.

a. *Governing Law*

"When a claimant wishes to obtain attorney's fees from the opposing party, the claimant must prove that the requested fees are both reasonable and necessary." *Rohrmoos Venture*, 578 S.W.3d at 489; *DeBoer v. Attebury Grain, LLC*, 684 S.W.3d 520, 533 (Tex. App.—Eastland 2024, no pet.). Whether the fees that are requested by a prevailing party are reasonable and necessary are questions of fact. *Rohrmoos Venture*, 578 S.W.3d at 498. In this regard, the lodestar method sets forth a two-step

standard for the factfinder to utilize so that it may ascertain what constitutes reasonable and necessary attorney's fees. *Id.*

First, the factfinder must determine the number of reasonable hours that counsel worked on the case; those hours are then multiplied by the reasonable hourly rate for counsel's services. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). At a minimum, the fee claimant's proof of reasonable hours should include "evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services." *Rohrmoos Venture*, 578 S.W.3d at 498. This lodestar calculation approximates "the reasonable value of legal services provided" and, when supported by sufficient evidence, is presumed to reflect "the reasonable and necessary attorney's fees that can be shifted to the non-prevailing party." *Sprague v. Roberts*, No. 11-23-00213-CV, 2025 WL 336964, at *3 (Tex. App.—Eastland Jan. 30, 2025, no pet.) (mem. op.) (quoting *Rohrmoos Venture*, 578 S.W.3d at 498–99).

Second, because other considerations may justify either an enhancement or a reduction to the lodestar figure, the factfinder must determine "whether evidence of those considerations overcomes the presumption and necessitates an adjustment to reach a reasonable fee." *Id.* at *4 (quoting *Rohrmoos Venture*, 578 S.W.3d at 501). This determination allows for the enhancement or the reduction of the lodestar figure "when considerations not already accounted for in the first step" establish that the lodestar figure represents either an unreasonably low or an unreasonably high fee award. *Id.* (quoting *Rohrmoos Venture*, 578 S.W.3d at 502). "[C]onsiderations already incorporated into the base calculation may not be applied to rebut the presumption that the base calculation reflects reasonable and necessary attorney's fees." *Rohrmoos Venture*, 578 S.W.3d at 501 (noting that *Arthur Andersen* lists the

22

factors "that may justify an adjustment" provided they are noncumulative of the base lodestar considerations (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997))).[3]

"General, conclusory testimony devoid of any real substance will not support a fee award." *Id.* Generalities about tasks that were performed provide insufficient information for the factfinder to meaningfully review and determine whether the tasks performed by counsel and the hours incurred were reasonable and necessary. *Sprague*, 2025 WL 336964, at *4 (citing *El Apple I*, 370 S.W.3d at 764). While contemporaneous billing records are not required, there must be some evidence to inform the factfinder of the amount of time that counsel dedicated to specific tasks so that it may meaningfully review the amount of fees requested. *Id.* (collecting cases).

"Texas law requires that the recovery of attorney's fees be reasonable under the particular circumstances of the case and that it bear some reasonable relationship to the amount in controversy." *Iola Barker v. Hurst*, 632 S.W.3d 175, 193 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (quoting *USAA Cnty. Mut. Ins. Co. v. Cook*, 241 S.W.3d 93, 103 (Tex. App.—Houston [1st Dist.] 2007, no pet.)); *see Arthur Andersen*, 945 S.W.2d at 818 (considering the amount in controversy). But a comparison of the amount in controversy to the amount of the fee award is only one factor in the analysis. *Id.* at 194 (citing *Cook*, 241 S.W.3d at 103); *see Dimension Homes, Inc. v. Young*, No. 01-19-00247-CV, 2020 WL 4457960, at *5 (Tex. App.—

---

[3]The non-exclusive *Arthur Andersen* factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the attorney; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the attorney or attorneys performing the services; and (8) whether the fee is fixed or contingent on the results obtained or the uncertainty of collection before the legal services have been rendered. *Arthur Andersen*, 945 S.W.2d at 818.

Houston [1st Dist.] Aug. 4, 2020, no pet.) (mem. op.) ("[T]he disparity between the amount of attorney's fees requested and the actual damages awarded is not dispositive on [the reasonableness of the award].").

   b. *Evidence of Attorney's Fees*

John Meazell, Sanchez's lead trial counsel, testified that Sanchez was originally represented by Landon Thompson, another attorney with the law firm that Meazell was associated with. At first, Meazell was minimally involved in the case but later assumed primary responsibility for representing Sanchez. Another attorney with the firm, R. Reeves, also performed some tasks in the case, as well as S.N. Harrigan, the firm's paralegal. Meazell's hourly rate increased from $350 to $400 during the pendency of the litigation. Thompson's hourly rate increased from $300 to $325, Reeves's rate was $275, and Harrigan's rate was $150. According to Meazell, these were reasonable rates because the usual and customary hourly rates in Erath County ranged between $300 and $500, depending on the attorney's experience. He testified that he had practiced law for almost thirty years, while Thompson and Reeves each had practiced law for over twenty years, and that he has handled many similar cases, including on appeal.

Meazell offered two spreadsheets, which he testified were derived from his billing software. Raitz objected to the admission of the spreadsheets on the basis that they were not business records, but were documents prepared for the purpose of trial, which constituted hearsay. Meazell testified that the billing summaries contained the content of his actual billing records—such as the task performed, the date and time it was performed, the person who performed the task, the amount of time expended, and the hourly rate—which were maintained on billing software and downloaded into the spreadsheets. Meazell explained that the billing summaries were not necessarily bills because bills would be more difficult to redact and consolidate, and because Sanchez ran out of money during the litigation, Meazell's

24

firm stopped sending invoices to Sanchez. Raitz re-urged its hearsay objection, and also objected under Rule 705 of the Texas Rules of Evidence that the billing summaries did not disclose the underlying facts or data upon which Meazell relied to formulate his opinions. *See* TEX. R. EVID. 705. The trial court overruled Raitz's objections.

The first billing summary contained redactions, which Meazell explained protected the disclosure of attorney-client privilege communications and attorney work product when the billing summary was produced during the litigation. A few entries were completely redacted; many of the partial redactions reduced the narrative to incomplete task descriptions such as "Call [or meeting] with client re:," "Meeting with JM re:," or "Conference with LHT regarding:[.]" Most of the redacted entries show work performed by Thompson or Harrigan.

The first billing summary was nine pages and encompassed approximately the first three years and three months of the litigation. It tabulated a total of $59,407.50 in fees. The second billing summary consisted of a single, unredacted page, which covered the last eighteen days of the litigation, including the trial. It showed a total of $30,142.50 in fees. Together, the accumulated fees totaled $89,550. Meazell testified that they were instead only seeking $87,417.50 in fees because the billing summaries did not show a reduction of Harrigan's paralegal rate to $125 an hour, the appropriate rate for Erath County.

Meazell testified that the case was undesirable because it involved complex legal issues and the amount in controversy was relatively small. He testified that the total fees sought, $87,417.50, were a reasonable and necessary amount for the complexity of the case and the three and one-half years of ongoing litigation. According to Meazell, he and his colleagues participated in depositions, prepared and filed motions to compel, performed legal research on a variety of issues, identified and located witnesses, and set a date for trial numerous times throughout

the litigation. He testified that he and his firm undertook to assist Sanchez and to zealously and ethically represent him and did so by vigorously litigating each issue. Meazell testified that the time spent on the case consisted of approximately 234.8 of attorney's hours and 51.1 of compensable paralegal hours over the course of three and one-half years.

On cross examination, Meazell agreed that one paralegal entry for 0.1 hours was clerical and not compensable. He disagreed that two other entries—which listed the tasks as "save Defendant's amended filings" and "[Thompson] emailed [Harrigan] regarding new trial date"—were clerical. Concerning the first challenged task Meazell testified: "I can only conclude that Mr. Thompson not only saved it, but he reviewed the document or scanned the document . . . in addition to saving it to the file," but he agreed that the task description did not say that. As for the second challenged task, Meazell explained that communications about trial deadlines are crucial in litigation, and he noted that there was no corresponding entry regarding Harrigan's administrative actions concerning the trial date, which was a clerical task.

Raitz calculated that Meazell had incurred fees of over $13,000 related to the deposition of Casey Raitz and asked whether this was accurate. Meazell replied he had not calculated the specific total of fees that were related to Casey's deposition—he would have to defer to Thompson—but he testified that the deposition had been a difficult and contentious matter during the litigation.

According to Meazell, the fees that were related to a motion for summary judgment that was prepared and filed but later abandoned were reasonable and necessary, even though the motion became moot after Raitz filed a counterclaim, because drafting and filing motions that are never heard or ruled upon is a normal part of litigation. Meazell disagreed that the amount of attorney's fees sought— more than $87,000—was disproportionate to the amount in controversy—less than

$27,000—because the case involved complex legal issues and disputes from its inception, and the litigation continued for over three years.

Meazell testified that he was not sure how much Sanchez had paid the firm in fees. He also could not state the amount of the retainer that Sanchez initially paid the firm. He testified that, initially, he was not the lead attorney on the case but supervised: "[Y]ou have people working underneath you. They basically handle it, kind of supervise, and ask questions of how this is going on, what's going on, the -- the -- the person underneath you who is handling the case may come to you for questions. That's basically what we have here."

Raitz's trial counsel, Stephen R. McKethan, testified that his hourly rate was $300 during this litigation and that he and his firm had incurred approximately $25,000 in attorney's fees. He also testified that, in his opinion, $87,417.50 did not reflect a reasonable and necessary award for this case.

c. *Application*

Under step one of the lodestar analysis, Raitz challenges the legal sufficiency of the evidence that the legal services provided, and the time spent performing them, were reasonable and necessary. Under step two, Raitz argues that (1) the fee award is disproportionate to the damages awarded by the jury, (2) the evidence to support the fee award is factually insufficient, and (3) the fee award is excessive. Additionally, Raitz contends that the trial court abused its discretion when it admitted Sanchez's counsel's billing summaries. Raitz argues that the fee award should be reversed or, alternatively, reduced by $27,000.

Raitz asserts that (1) Meazell's billing summaries contained many entries that were so vague, generic, clerical, and redacted that the billing summaries constitute no evidence of the requested attorney's fees amount, and (2) there is no evidence that the amount of time recorded in the billing summaries was reasonable. Specifically, Raitz points to redacted entries in the first billing summary that identify

27

a meeting, conference, or call with Meazell, another attorney, or the client, but the topic of the interaction is redacted. According to Raitz, these redactions foreclose an independent assessment of the necessity of the time billed and do not provide any evidence of the specific services that were performed. *See, e.g.*, *Westheimer v. Ziemer*, 702 S.W.3d 621, 632–33 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (holding that heavily redacted bill records of the specific tasks performed were indiscernible and, standing alone, were legally insufficient to establish that the awarded fees were reasonable and necessary (citing *Rohrmoos Venture*, 578 S.W.3d at 495)); *Person v. MC-Simpsonville, SC-1-UT, LLC*, No. 03-20-00560-CV, 2021 WL 3816332, at *8–9 (Tex. App.—Austin Aug. 27, 2021, no pet.) (mem. op.) (recognizing that attorney time records may require some redaction to preserve attorney-client privilege but holding that the records before the court were so excessively redacted that they lacked sufficient specificity required to prove that the fees were reasonable and necessary).

Despite Raitz's argument, we note that "[i]t is not improper to redact billing records to preserve attorney-client privileged communications" or attorney-work product, and in fact such redactions are commonplace. *Person*, 2021 WL 3816332, at *8; *see Canadian Real Estate Holdings, LP v. Karen F. Newton Revocable Tr.*, No. 05-20-00747-CV, 2022 WL 4545572, at *4 (Tex. App.—Dallas Sept. 29, 2022, no pet.) (mem. op.) (noting when attorney's invoices are offered as evidence, they are routinely redacted to protect attorney-client and work-product privileges). Moreover, the proper inquiry is not whether billing records are excessively redacted but, rather, whether the evidence as a whole satisfied the minimum evidentiary requirements to support the fee award. *Isomeric Indus., Inc. v. Triple Crown Res., LLC*, No. 01-22-00768-CV, 2023 WL 6884172, at *6 (Tex. App.—Houston [1st Dist.] Oct. 19, 2023, no pet.) (mem. op.) (citing *El Apple*, 370 S.W.3d at 762–63); *see Rohrmoos Venture*, 578 S.W.3d at 498.

In this instance, the complained-of redactions were not so significant as to render the billing records insufficient, especially when combined with Meazell's testimony. *See, e.g.*, *Bailey v. Smith*, 581 S.W.3d 374, 398 (Tex. App.—Austin 2019, pet. denied) (concluding that fee records detailing specific amounts of time attorneys spent on tasks such as "Drafting/Revising Documents," "Reviewing/Research Background Info," "Conferring with AG Personnel," and similar categories were sufficiently specific to enable the trial court to make a meaningful evaluation of the reasonableness of fees claimed for each attorney in the case); *Isomeric Indus.*, 2023 WL 6884172, at \*4–7 (examining cases and determining that partially redacted billing records and testimony that the attorney "personally performed, observed, or supervised the performance of the legal services in this case" was sufficient evidence to support the fee award); *Med. Disc. Pharm., L.P. v. State*, No. 01-13-00963-CV, 2015 WL 4100483, at \*17 (Tex. App.—Houston [1st Dist.] July 7, 2015, pet. denied) (mem. op.) (concluding that a time summary which identified timekeepers, hours devoted to each activity, and descriptions of activities that were divided into categories such as "attend/appear at hearing," "drafting/revising pleadings," and "reviewing/researching law," was sufficiently specific because the summary indicated the time each person spent on particular categories and tasks).

Meazell testified that the hourly rates shown in the billing summaries and the tasks and time spent on them were reasonable and necessary because they established the vigorous and contentious litigation of contested and complex issues that spanned over more than three years, which he had personally supervised or led. We conclude, based on the record before us, that the billing summaries and Meazell's testimony together supply sufficient proof under the first step of the lodestar method that the legal services provided, and the time spent performing them, were reasonable and necessary. *See Isomeric Indus.*, 2023 WL 6884172, at \*4–7.

Next, Raitz argues that (1) the fee award is disproportionate to the damages awarded by the jury, (2) the evidence is factually insufficient to support the fee award, and (3) the award is excessive.[4]

Although Raitz is correct that we must consider "the delta" between the amount in controversy and the fee award, if Sanchez supported the base lodestar calculation with sufficient evidence, there is a "strong presumption" that the reasonable and necessary attorney's fees that he incurred can be shifted to Raitz. *See Rohrmoos Venture*, 578 S.W.3d at 499; *Dimension Homes*, 2020 WL 4457960, at *5 ("Attorney's fees should bear some reasonable relationship to the amount awarded, but 'there is no rule that fees cannot be more than the actual damages awarded.'" (quoting *Metroplex Mailing Servs., LLC v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 900 (Tex. App.—Dallas 2013, no pet.), *abrogated on other grounds by Rohrmoos Venture*, 578 S.W.3d at 496)). It is only in "rare circumstances," in which the lodestar method "does not adequately take into account a factor that may properly be considered in determining a reasonable fee," that the presumption may be overcome. *Iola Barker*, 632 S.W.3d at 194 (quoting *Rohrmoos Venture*, 578 S.W.3d at 502).

Raitz argues that Meazell failed to explain why so much time and expense was dedicated to (1) Casey's deposition, (2) motions to compel that were largely "unsuccessful," and (3) the motion for summary judgment that was never presented to the trial court. Raitz also contends that the billing summaries lack the quality of an invoice that is typically submitted to a paying client who would scrutinize the bill because Meazell did not actually bill Sanchez. Thus, Raitz contends that the fee award should be reversed or, alternatively, reduced by $27,000.

---

[4]Raitz's factual sufficiency argument is contingent on a partial reversal of the damages award; therefore, we need not address it.

Contrary to Raitz's assertions, Meazell testified that he and his law firm undertook to assist Sanchez and to zealously and ethically represent him and did so by vigorously litigating every issue in the case. He also testified that the case involved complex legal issues, that Casey's deposition was a difficult and contested discovery matter, and that drafting and filing motions that are unsuccessful or not heard or ruled on are a customary part of the litigation process. Irrespective of its arguments, we disagree with Raitz that the disproportion between the fee award and the damages awarded in this case, on its own, justifies a reduction. *See Johari v. Ayva Ctr., LLC*, No. 14-17-00912-CV, 2020 WL 897385, at *2 (Tex. App.— Houston [14th Dist.] Feb. 25, 2020, no pet.) (mem. op.) (collecting cases). We conclude that the evidence is legally and factually sufficient to support the fee award. *Hizar*, 672 S.W.3d at 799 (citing *Rohrmoos Venture*, 578 S.W.3d at 490).

Finally, Raitz contends that the trial court abused its discretion when it admitted the billing summaries because they constitute hearsay and are not subject to any exception to the rule against hearsay. We disagree.

Here, the billing summaries were admissible under the business-records exception to the hearsay rule. *See* TEX. R. EVID. 803(6). This exception has four requirements: (1) the records were made and kept in the course of a regularly conducted business activity; (2) it was the regular practice of the business activity to make the records; (3) the records were made at or near the time of the event that they record; and (4) the records were made by a person with knowledge and who was acting in the regular course of business. *Id.*; *Estate of Stavron*, No. 02-20-00404-CV, 2021 WL 5227081, at *4 (Tex. App.—Fort Worth, Nov. 10, 2021, no pet.) (mem. op.).

Meazell testified that his law firm uses a software billing program into which they regularly input billing information at or near the time the activity is performed, including the task description, the date of the task, the billing rate for the attorney

performing the task, and the amount of time expended for each task. That information is then downloaded into a spreadsheet (the billing summaries). Meazell testified that the billing summaries contain all the relevant billing information and simply present the information in a more manageable format. We conclude that the trial court did not abuse its discretion when it admitted the billing summaries. *See* TEX. R. EVID. 803(6); *Stavron*, 2021 WL 5227081, at \*4.

For the reasons discussed above, we overrule Raitz's fifth issue.

### III.  *This Court's Ruling*

We affirm the judgment of the trial court.


W. STACY TROTTER

JUSTICE


July 30, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.